# UNITED STATES DISTRICT COURT
for the

Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>Keith Christopher<br>Tanisa Smith-Symes<br>Isaiah Wells<br><br>*Defendant(s)* | )<br>)<br>)  Case No. 3:21-mj-71389 MAG<br>)<br>)<br>)<br>) |

FILED
Aug 31 2021
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **May 18-June 17, 2020** in the county of **Marin** in the **Northern** District of **California**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1346 and 1349 | Conspiracy to commit honest services fraud using interstate wires |

This criminal complaint is based on these facts:

See the attached affidavit of FBI Special Agent Candace Bond

☑ Continued on the attached sheet.

Approved as to form  */s/ Frank J. Riebli*
                    AUSA  Frank Riebli

*/s/ Candace Bond*
*Complainant's signature*

FBI Special Agent Candace Bond
*Printed name and title*

Sworn to before me over the phone pursuant to
Fed. Rule Crim. Proc. 4.1 and 4(d).

Date: 8/30/3031

*Judge's signature*

City and state: San Francisco, CA

Hon. Joseph C. Spero, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT

I, Candace L. Bond, a Special Agent of the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state the following:

## I. INTRODUCTION AND PURPOSE OF THE AFFIDAVIT

1. I make this affidavit in support of applications for criminal complaints charging Keith CHRISTOPHER, Tanisa SMITH-Symes, and Isaiah WELLS with conspiracy to commit honest services fraud, in violation of 18 U.S.C. §§ 1343, 1346 and 1349. Based on my training and experience and the facts set forth in this affidavit, I submit that there is probable cause to believe that CHRISTOPHER, SMITH, and WELLS, and others, have committed those offenses.

2. The facts in this affidavit come from my personal observations, my training and experience, information from records and databases, information obtained through Grand Jury subpoenas and search warrants, and information obtained from other agents and witnesses. This affidavit does not set forth all my knowledge about this matter; it is intended to only show that there is sufficient probable cause for the requested warrant.

## II. AFFIANT BACKGROUND

3. I am a Special Agent of the FBI and have been so employed since March 2019. I attended and graduated the FBI Academy in Quantico, VA. During my 21 weeks at the Academy, I received training on federal criminal procedure and investigative techniques to include interviewing witnesses and subjects, physical and electronic surveillance, data analysis, undercover operations, and human source development and operation, among others.

4. After completing the FBI Academy, I was assigned to the San Francisco Field Division where I have investigated public corruption. While the majority of my investigative experience has focused on public corruption, I have participated in investigations related to organized crime, violent crimes against children, domestic terrorism, and drug trafficking.

5. In my investigative experience I have personally conducted dozens of interviews, participated in over 100 surveillance operations, monitored electronic surveillance devices such as pole cameras and GPS tracking devices, participated in undercover operations, executed search and arrest warrants and monitored Title-III wire intercepts.

## III. APPLICABLE LAW

6. The mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, make it unlawful to transmit or cause to be transmitted through the mail, or by wire or radio, any writings, signs or signals in furtherance of a scheme to defraud or obtain money or property by false pretenses. A scheme to defraud includes a scheme to deprive another of the intangible right to honest services.

Id. § 1346. It is unlawful to conspire to commit wire fraud or honest services fraud. Id. § 1349.

## IV.     FACTS ESTABLISHING PROBABLE CAUSE

### A.     Overview

7.     San Quentin State Prison ("SQP") is a state prison located in Marin County, in the Northern District of California. The California Department of Corrections & Rehabilitation ("CDCR") operates SQP. The FBI is investigating the illegal smuggling of contraband into SQP's Death Row, and the role that one or more corrupt Corrections Officers ("COs") play in that smuggling.

8.     Inmate 1 is an inmate housed in SQP's East Block, a part of SQP reserved for inmates condemned to death. As described in further detail below, I believe that Inmate 1 works with a corrupt CO, Keith CHRISTOPHER, to smuggle contraband (including cell phones) into SQP's East Block, and works with fellow inmates to coordinate the distribution of that contraband within the prison. I further believe that Inmate 1 relies on his girlfriend or paramour on the outside, Tanisa SMITH-Symes, to coordinate the delivery of contraband and bribery payments to CHRISTOPHER. I believe that CHRISTOPHER uses Isaiah WELLS and Associate 2 to receive the contraband and bribery payments from SMITH and other facilitators, on his behalf, in order to prevent CHRISTOPHER from being tied directly to Inmate 1.

### B.     Identification of Inmate 1's Phone

9.     On November 12, 2020, COs from the Investigative Service Unit (ISU) at San Quentin State Prison (SQP) conducted a search of Inmate 1's cell. Inmate 1 was the sole occupant of that cell. Prior to exiting his cell, Inmate 1 handed his jacket to the ISU Officer assigned to search his cell. Upon searching the jacket, the officer found and seized one Samsung cell phone.

10.     Cellular phones are considered contraband in California state prisons. The California Code of Regulations, 15 C.C.R. § 3006 ("Contraband") provides, in part, that "Inmates shall not possess wireless communication devices capable of making or receiving wireless communications, except as expressly authorized by the Secretary, pursuant to subsection 3190(k)(8)." Inmate 1 was not authorized to have a cellular phone. Accordingly, I believe the Samsung cell phone seized from him on November 12, 2020, was a contraband phone. ISU officers subsequently forensically processed the phone and downloaded its contents, including images, videos, emails, and text messages sent on multiple applications. This extraction was later provided to the FBI.

### C.     Bribery and Contraband Smuggling

11.     I know from my training and experience that cellular telephones are a valued commodity in prison that can also affect the safety and security of the inmates and employees of the institution. I know that CDCR inmates use cellular phones to circumvent the mandatory

screening process of all incoming and outgoing communication from CDCR institutions. I also know that inmates have used cellular phones to facilitate and coordinate violent attacks against inmates as well as the smuggling and trafficking of contraband such as cell phones and drugs.

12. I know based on my training and experience that cellular devices, and other contraband, are sometimes introduced into the prison by corrupt prison staff, including COs.

13. As described below, analysis of Inmate 1's phone, as well as CHRISTOPHER's, SMITH's, WELLS' and others' email, financial, and other records indicate that Inmate 1, SMITH, CHRISTOPHER, WELLS, and others are involved in a conspiracy to smuggle contraband, including cell phones, into the prison. The operation of the conspiracy is illustrated in a May 2020 transaction described in detail below. In summary, another inmate housed in SQP's East Block ("Inmate 2") purchased cell phones and related equipment and had these devices shipped, via Amazon, to SMITH. SMITH also received instructions, via a telephone believed to be used by the CO (CHRISTOPHER) to reship the devices to an address in Tracy, California, where I believe WELLS resided. Meanwhile, Inmate 2 communicated with Inmate 1 about the money that Inmate 2 would transmit to Inmate 1 that would be paid to the corrupt CO. SMITH received these funds from Inmate 2 and Inmate 2's associates. Via texts, Inmate 1 asked SMITH to re-negotiate the CO's fee for smuggling the phones into the prison, and SMITH confirmed that the fee had been lowered and that the money had been forwarded to the CO. Bank records document the receipt of these funds in WELL's account.

14. On May 9, 2020, Inmate 2 sent Inmate 1 text messages indicating that he (Inmate 2) had purchased a pack of 10 AT&T cell phone SIM cards, three Mobile Game Controllers, and three Jelly Pro cellular phones and had them shipped to SMITH's address in Las Vegas. The addressee for the shipment was Inmate 1's middle name and surname.

15. Records provided by Amazon pursuant to a federal grand jury subpoena indicate between May 9, 2020, and May 24, 2020, the following Amazon packages were sent to SMITH's address; the billing name associated with the orders is similar to Inmate 2's name:[1]

- (10 Pack) Authentic AT&T ATT SIM Card Micro/Nano/Standard GSM 4G/3G/2G LTE Prepaid/Postpaid Starter Kit Unactivated Talk Text Data & Hotspot;
- 3 Mobile Game Triggers, Norhu Mobile Game Controllers for PUBG Mobile, Fortnite Mobile Phone Gaming Triggers Sensitive Shoot and Aim Buttons Shooter Handgrip Compatible with Android & iPhone- 1Pair (L1R1);
- 3 Unihertz Jelly Pro, The Smallest 4G Smartphone in The World, Android 8.1 Oreo Unlocked Smart Phone with 2GB RAM and 16GB ROM, Pearl White;
- Samsung Galaxy S10 Lite New Unlocked Android Cell Phone, 128GB of Storage, GSM & CDMA Compatible, Single SIM, US Version, Black;

---

[1] That same Amazon account sent at least six cell phones, charging cords, and SIM cards to "Isaiah Wells" at an address in Fairfield, CA, between April 2018 and May 2019. It is worth noting that WELLS was arrested several times in or near Fairfield between 2009 and 2013, and that his two criminal convictions were adjudicated in Solano County Superior Court in Fairfield.

- 2 USB C to 3.5MM Audio Adapter - USB Type C to AUX Headphone Jack Hi-Res DAC Cable Adapter for Pixel 4 Samsung Galaxy S21 S20 Ultra S20+ Note 20 OnePlus 7T and More;
- USB C to 3.5mm Headphone Adapter Compatible for Pixel 4 4XL 3 3XL 2 2XL, Galaxy Note 10/10+/S20/20+/20 Ultra and More USB C Phone(Not for Moto and OnePlus) (White); and,
- Caseology Vault for Samsung Galaxy S10 Lite Case (2020) - Matte Black.

16. On May 11, 2020, Inmate 1 and Inmate 2 exchanged the following text messages:

| | |
|---|---|
| Inmate 2 | i got $ rdy too, when dude rdy |
| Inmate 1 | Ok cool |
| Inmate 2 | i collected everything |
| Inmate 2 | hahaha |
| Inmate 1 | 💯 💯 |
| Inmate 2 | im talking$ for toys\ |

17. Based on my training and experience, I believe that when Inmate 2 said he had "$ rdy" "when dude rdy," he meant that he had money ready to pay someone, whom he referred to as "Dude," whenever "Dude" was ready to perform a task. Inmate 2 then clarified that he meant "$ for toys." I know that the term "toys" is common slang among prisoners for contraband cell phones. Thus, I believe that Inmate 2 was indicating to Inmate 1 that Inmate 2 had money to pay someone to bring contraband cell phones into SQP.

18. On May 18, 2020, Inmate 1 and Inmate 2 had the following exchange:

| | |
|---|---|
| Inmate 1 | Just give him # to hit my girlfriend off burner |
| Inmate 1 | Keep ya pants on lmao |
| Inmate 2 | so he got burners |
| Inmate 2 | we moving |
| Inmate 2 | good |
| Inmate 1 | Yea.he here gave him # @ wlk |

19. Based on my training and experience, I know that people involved in criminal activity often use unregistered cell phones – called "burners" – to conduct their unlawful business. They do this because unregistered cell phones are difficult to trace to a specific person, thus making it more difficult to investigate the persons using them. I believe that when Inmate 1 told Inmate 2 that he "Just give him # to hit girlfriend off burner," he was telling Inmate 2 that he had just passed SMITH's number to the CO or whoever was going to smuggle or help the CO smuggle the phones into SQP, so that the CO could contact SMITH from his (the CO's) burner phone to coordinate the delivery of contraband items to the CO for the CO to smuggle in to SQP.

20. I reviewed T-Mobile subscriber records for the account associated with telephone number (510) 694-9950, the number I believe to be assigned to "Dude's" burner phone for reasons discussed more fully below. Those records show that the phone, "Target Telephone 1," was re-activated on May 18, 2020, the same day Inmate 1 said he had passed his girlfriend's number to "Dude." Target Telephone 1 contacted SMITH via text message on May 20, 2020.

21. On May 26, 2020, Inmate 1 told Inmate 2 "TD on toy" in a text message. I know from my training and experience and my discussions with CDCR investigators that "TD" is short for "touchdown," which is a word inmates use to indicate that contraband has arrived at its intended destination. I have seen this same code used in other messages, along with indicators that specific items of contraband had arrived within the prison. In this message, I believe Inmate 1 was notifying Inmate 2 that the cell phones Inmate 2 ordered had arrived at SMITH's residence. Inmate 2 then responded in a text to Inmate 1 "im sending you$1000 Today" "cover dude," which I believe meant that he was sending $1,000 to Inmate 1 to pay "Dude," the corrupt CO. Inmate 2 then sent a number of messages indicating that he was breaking up the payment: "Im sending you $600 venmo" "another$300 different venmo" "$100 cashapp" "Cover$1000".

22. Cash App and Venmo records indicate that on May 26, 2020, the same day Inmate 2 told Inmate 1 that he (Inmate 2) was sending Inmate 1 money, SMITH received $600 from one Venmo account for "John," and $300 from a second Venmo account for (emoji of a cake). I know that "John" is one of Inmate 2's monikers. I believe that the users of the two Venmo accounts sent money to SMITH on behalf of Inmate 2 to help pay for the contraband being smuggled into the prison. Review of Inmate 2's Cash App account indicates that he sent $100 to an account under the name "T S" for "beer." SMITH's Cash App records indicate that she received $100 from an account in Inmate 2's name. Inmate 2 also sent Inmate 1 a screen shot of what appears to be a Cash App transaction stating "You sent $100 to T S."

23. According to a summary of CDCR records, the user of the first Venmo account is an approved visitor of Inmate 2 and is listed as Inmate 2's "friend". Inmate 2 has been in contact with that person twelve times between November 27, 2020 and February 3, 2021, via Global Tel Link, the prison's recorded telephone system.

24. In addition, the same Amazon account that sent the items described above to SMITH's address and to WELLS also sent items (non-metallic razor blades and a foldable knife) to the user of the second Venmo account in April 2019.

25. Considering Inmate 2's relationship to the users of the two Venmo accounts and the timing of the transactions, I believe the payments SMITH received from Inmate 2 and the two Venmo accounts were sent on behalf of Inmate 2.

**D.  Images found in Smith's Google Drive**

26. On May 1, 2021, Google provided the FBI with email and Google Drive content for SMITH's email address pursuant to a federal search warrant. SMITH's Google Drive contained the following images. Based on the metadata of these images, I believe they were taken on May 23, 2020:

///

///

///






27. Although I was not able to identify all of the items in the image, I am able to identify at least 6 Jelly Pro cell phones, and AT&T sim cards, both of which are similar items to the ones that Inmate 2 ordered from Amazon.

28. Based on my training and experience, I know that often inmates will have contraband sent to an outside facilitator, who will inventory the items and ship them to the prison employee or the employee's associate. The employee will then smuggle the contraband into the prison and usually drop the items off with a designated inmate. Based on these images, the text

6

messages between Inmate 1 and Inmate 2, Amazon records, and other facts mentioned below, I believe Inmate 2 ordered the above stated items on Amazon and had them delivered to SMITH. Later, at the direction of Inmate 1, I believe SMITH wrapped and labeled the contraband items, to include but not limited to, the ones mentioned in Inmate 2's messages.

29. Based on my review of the extraction of Inmate 1's phone, on May 25, 2020, Inmate 1 sent SMITH the following message, "Tell dude it will be 7big phones 9 lol jellys mailed off after the other to come in the mail Total is 7big 9lil jellys." I believe that, in these messages Inmate 1 was instructing SMITH to tell the CO that they were going to have 7 large cell phones and 9 small ones ("jellys") for the CO to smuggle into SQP.

30. SMITH's Google Drive contained the following screenshots, taken in May 2020, of a text message exchange I believe she had with a person using Target Telephone 1:



31. In the photo above, SMITH forwarded Inmate 1's original instructions, verbatim, to the phone number that begins (510) 694-99--. These are the first eight digits of Target Telephone 1. Thus, I believe these messages were between SMITH and the corrupt CO. I also believe that, when the CO responded, "let me know when you ready to send so I can give you the name & addy," he meant that he would provide SMITH the name and address to send the phones to once SMITH was ready to send them. I further believe that, in the second exchange, the CO provided the name "Steve Wallace" and the address 284 William Pishner Jr. Drive in Tracy, CA

7

95376. Finally, I believe that the CO asked SMITH to make the delivery a drop off not requiring the recipient to sign for the package in order to avoid having someone receive the package who could be identified later.

32.     The day of the second exchange between SMITH and Target Telephone 1, SMITH and Inmate 1 had the following exchange (discovered in Inmate 1's phone):
          SMITH:     Txt me what u want me to do I got the address
          Inmate 1:  Mail everything off
          Inmate 1:  Nxt day or 2 days mail delivery
          SMITH:     Ill txt u when its done

33.     Based on my training and experience, I believe that in this exchange SMITH was notifying Inmate 1 that she had received the address to send the contraband phones and was asking Inmate 1 what he wanted her to do. I believe Inmate 1 instructed her to send the package containing the contraband to the address using a next day delivery or 2-day mail delivery service.

34.     SMITH's Google Drive also contained the following images taken on May 27, 2020:




8




35. Based on the conversation between Inmate 1 and SMITH, and the screenshots above, I believe SMITH sent the package containing the contraband to be smuggled into SQP to the name and address that the user of Target Telephone 1 provided her, Steve Wallace at 284 William Pishner Jr. Dr. in Tracy, CA, using UPS next day air service.

36. Analysis of the extraction from Inmate 1's phone revealed that SMITH also sent Inmate 1 those images, letting him know that the task had been completed.

37. Further review of that extraction also revealed that during that same period, Inmate 1 exchanged messages with a contact in his phone, saved as "JB1," that also appear to relate to Inmate 1 coordinating the smuggling of contraband phones into the prison. On May 27, 2020 Inmate 1 sent JB1 images which appear to depict 14 cell phones (with accessories, including charging cords and earphones), wrapped in saran wrap, as well as boxes of "Jelly" and J7 phones, which I know are (or were) models of Samsung cellular phones. Inmate 1 and JB1 exchanged the following messages:

| | | |
|---|---|---|
| | JB1 | Who got these |
| | Inmate 1 | I just mailed them to the C/O |
| | JB1 | You got people buying them |
| | Inmate 1 | Yea |
| | JB1 | How much you paid for them |
| | Inmate 1 | I ordered them off Amazon pay the c/o 500 per phone |
| | JB1 | How much you getting them off |
| | Inmate 1 | 900 |
| | JB1 | ok |
| | Inmate 1 | Most them presold already |
| | JB1 | Cool |
| | Inmate 1 | I gotta leave here up $2,500<br>Or more** |

9

| | |
|---|---|
| JB1 | More is better |
| Inmate 1 | Man I just wish he would bring in work frfr I get $2,000 of a zip of weed |
| JB1 | Don't trip crip you still getting money |
| Inmate 1 | 4,000 off heroin |

38. Based on my training and experience, I believe that, in this exchange, Inmate 1 sent JB1 images of the phones that a corrupt CO had agreed to smuggle into the prison for Inmate 1. I believe that when Inmate 1 said, "I just mailed them to the C/O," he was referring to the package SMITH mailed to the name and address the user of Target Telephone 1 had given her. I further believe that when Inmate 1 said that he "pay[s] the c/o 500 per phone," he meant that he pays the CO $500 for each phone the CO brings into the prison. I further believe that when JB1 asked how much Inmate 1 was "getting them off," he was asking how much Inmate 1 sold them for to other inmates. I believe that Inmate 1's response, "900," meant that he sold them for $900 each, and his statement "Most them presold already" meant that he had already sold most of the phones depicted. I further believe Inmate 1's statement, "Man I just wish he would bring in work frfr [for real for real]" and "I get $2,000 of a zip of weed" meant that he wished the CO would bring drugs ("work") into the prison, and not just contraband cell phones, because he could sell an ounce ("zip") of marijuana ("weed") for $2,000, which appears to be a much higher profit than he was making on cell phones. Inmate 1 also appeared to indicate that he could get sell an ounce of heroin for $4,000.

39. Based on the conversations described above between Inmate 1 and Inmate 2, and between Inmate 1 and JB1, the images found in SMITH's Google Drive, and the instructions given by the user of Target Telephone 1, I believe Inmate 2 ordered phones and accessories from Amazon and had them delivered to SMITH. I believe SMITH packaged up the items as directed by Inmate 1 and prepared them for shipment. I further believe that SMITH was given direction from the corrupt CO, the user of Target Telephone 1, to ship the package to Tracy, CA to be received by one of the CO's associates in order to help conceal the CO's involvement. In this case, I believe the name of the package's addressee, "Steve Wallace," to be a false name. The destination address is associated with Isaiah WELLS in public records and remote surveillance recently observed him there.

40. On May 29, 2020, two days after SMITH sent Inmate 1 the images of the packages addressed to "Steve Wallace," the text messages from Inmate 1's phone show that he instructed her to re-negotiate the smuggling fee for "Dude." Inmate 1 said, "Tell dude I need him to wrk with me on this bundle of stuff I can give him the 50 on each big one but I collected 250 for all them small ones I thought the price was going to be tha same...forward this message to him." Based on my training and experience, I believe that, in this message, Inmate 1 was indicating that he thought the fee was going to be lower because some of the phones were smaller ("small ones"), and that he wanted the CO ("dude") to lower the price. That same day, Inmate 1 forwarded Inmate 2 an image of a text message that I believe SMITH had previously sent to Inmate 1. I believe the image showed "Dude's" response to Inmate 1's request for a lower price: "Tell him I can take a rack off what I told him at first". I know that "rack" is common slang for $1,000. Thus, I believe that "Dude" was agreeing to discount the smuggling fee by $1,000. Inmate 1 told Inmate 2, "He first told me 7500." I believe this means that

10

"Dude" originally agreed to smuggle the phones in for $7,500 (which would be $500 per phone for 15 phones), but had agreed to reduce the price to $6,500 perhaps because many of the phones were smaller (and thus sold for less).

41. On May 29, 2020 SMITH sent Inmate 1 three screenshots, indicating that she had sent $6,500 to WELLS by three different means. The first image, which I believe to be a screenshot from Cash App, indicated that she sent $750 to "Isaiah Wells." The second image, which I believe to be a screenshot of the Venmo app, indicated she sent $4,000 to "Zay Wells." And the third screenshot, which I believe to be another screenshot from Cash App, indicated that she sent for $1,750 to "Isaiah Wells" with account "$zay88wells." Venmo records indicate that the "Zay Wells" account is registered to "Zay Wells" at **Target Location 3**, with a phone number ending in -4386. Cash App records indicate that the Cash App account was registered to "Isaiah Wells" at the same address and phone number, and used the alias "zay88wells." The phone number is also registered to **Target Location 3**.[2] As noted below, I believe that WELLS resides at **Target Location 3**, and that is the same location SMITH sent the box of phones and other items in May 2020.

42. SMITH's Cash App records confirm that on May 29, 2020, she sent $750 to an account operated under the name "Isaiah Wells," and another $1,750 to that same account a few minutes later. SMITH's Venmo records indicate that, also on May 29, 2020, at about the same time as the other two transactions, she sent $4,000 to an account operated under the name "Zay Wells." Based on the messages between Inmate 1 and JB1, Inmate 1 and SMITH, and Inmate 1 and Inmate 2, I believe that the $6,500 SMITH sent to WELLS was the payment intended for the corrupt CO who was going to smuggle the phones into SQP.

43. Based on my training and experience, and review of Venmo's Standard Bank Transfers FAQ sheet, I know whenever a person receives a payment on Venmo, the money is put into the person's Venmo account. The person must initiate a bank transfer in order for the funds to be sent to his bank account. The person has the option to send the funds to his bank account using either the "Standard" or "Instant" option. I know that when using the "Standard" option there is no fee charged and it may take one to three business days for the funds to reach the person's bank account. I also know that if a person wants to move the money from his Venmo account into his bank account more quickly, he can use the instant transfer feature. Instant transfer is a feature that allows Venmo users to transfer the money in their Venmo account to certain bank accounts or eligible Visa and Mastercard debit cards, typically within 30 minutes. A 1.5% fee (with a minimum fee of $0.25 and a maximum fee of $15) is deducted from the transfer amount for each transfer.

44. Review of WELLS' financial records indicate that on June 1, 2020, three days after his Venmo account received the $4000 from SMITH's Venmo account, his Bank of America account received a $2989 deposit under the description "Transfer VENMO," and a $991 deposit under the description "Transfer VENMO," a total of $3980.

45. Cash App's website indicates that Cash App also offers standard and instant

---

[2] The phone is in the name of the woman who, based on social media posts, appears to be the mother of WELLS' child.

deposits to linked bank accounts. I know that standard deposits are free and arrive within 1-3 business days and instant deposits are subject to a 1.5% fee (with a minimum fee of $0.25).

46. Review of WELLS' financial records also indicated that on June 1, 2020, three days after his Cash App account received a total of $2500 from SMITH's Cash App, his Bank of America account received a $2462.50 deposit under the description "Cash App*Cash."

47. Further review of those records revealed that a $6,000 cash withdrawal was made from WELLS' bank account on June 1, 2020. Thus, I believe when WELLS received the money transfers from SMITH, which I believe were bribery payments for the CO to smuggle the contraband into the prison, he then transferred the money from his Cash App and Venmo accounts to his Bank of America account, and took a cash withdrawal in order to give the money to the CO with no digital trail of the CO receiving money from any individual associated with an inmate.

48. I know, based on my training and experience, that when an individual is involved in a conspiracy to smuggle contraband into prisons, they usually pay their cut-outs a small fee for their role in the operation. I believe that WELLS kept the remainder of the money (about $500) as his fee for accepting the money on behalf of the CO.

49. Public records and social media analysis indicate that WELLS and CHRISTOPHER have the same father. A family photo posted to Facebook on December 25, 2017 includes the father, CHRISTOPHER, WELLS, and several other family members. For this reason and the reasons stated below, I believe that CHRISTOPHER is the corrupt CO working with WELLS and SMITH and Inmate 1.

### E. Identification of Target Telephone 1 and User

50. The following screenshot, taken on June 17, 2020, between SMITH and Target Telephone 1 was found in SMITH's Google Drive:



51. On June 17, 2020, SMITH sent a cropped copy of this screenshot to Inmate 1. The phone number and first two messages were removed from the image. Based on my training and experience and the nature of the conversation in the screenshots, I believe that in this exchange, the user of Target Telephone 1 was asking SMITH to tell Inmate 1 ("the homie") that he (the user of Target Telephone 1) would not be at work for the next two weeks.

52. CDCR investigators provided me CHRISTOPHER's work and leave schedules during this period. Those records indicate that CHRISTOPHER took holiday leave June 17, 2020, and was on administrative time off from June 18, 2020, through July 1, 2020, which is approximately two weeks of time off. This matches what the user of Target Telephone 1 told SMITH about his time off. Further, the CDCR records indicate that CHRISTOPHER was working on May 18, 2020, the day Inmate 1 told Inmate 2 he had passed his girlfriend's number to "Dude" "@ wlk," which I believe means "at walk," or, during one of the periods when the guards walk around the housing unit and check on the inmates. Those records also indicate that CHRISTOPHER was working in SQP's East Block – Death Row – that day.

53. Although the full number is not present in the screenshot images, analysis of toll records for SMITH's known number 702-327-2289, provided to the FBI in response to a federal grand jury subpoena, indicate that the messages pictured above were between SMITH and the phone number 510-694-9950, Target Telephone 1. Analysis of those records also revealed 32 contacts between SMITH and Target Telephone 1 between May 22, 2020, and June 29, 2020.

54. Target Telephone 1 is subscribed to "Jason Taylor" at an address in Pittsburg, CA. I believe the subscriber's name is fictitious. According to public record databases, the aforementioned address is associated with a relative of CHRISTOPHER and WELLS. This association was made through social media analysis; in social media posts, they refer to each other as "cousins," and appear to have a grandmother in common. Additionally, physical surveillance was conducted June 21, 2021, at the residence. A vehicle registered to that relative was present at the residence.

55. According to records obtained from T-Mobile, Target Telephone 1 number has been subscribed to "Jason Taylor" since March 7, 2018. The number has been activated, deactivated, and reactivated several times. For example, the phone was activated on January 15, 2020, deactivated on May 7, 2020, and then reactivated May 18, 2020. As mentioned above, May 18, 2020, is the day that Inmate 1 told Inmate 2 that he (Inmate 1) had given "Dude" his (Inmate 1's) girlfriend's number for "Dude" to contact her from "Dude's" "burner" phone. Further, toll analysis reveals that, between January 1, 2020, and May 30, 2021, there were only 31 outgoing contacts from Target Telephone 1, 14 of which were text messages to SMITH. There was also a call on May 20, 2020 from Target Telephone 1 to a phone number associated with 284 William Pishner Jr. Dr, Tracy, CA, the same address to which SMITH sent the package of contraband. I believe this pattern of limited usage is consistent with that of a "burner phone," meaning a phone that is used only or primarily for criminal purposes. Phone company records indicate that the burner phone was still registered and activated as of July 29, 2021. Based on the activation and deactivation and use patterns, and the consistency of the subscriber over time, I believe that one person is using Target Telephone 1 and that he activates it when he believes he

13

will need it for criminal purposes – such as to facilitate the smuggling of contraband into SQP and/or the payments for that smuggling – and then either deactivates it or stops using it until the next time he is going to smuggle contraband into the prison. I further believe that the person exchanging messages with SMITH in May and July 2020 is still the user of Target Telephone 1.

56. The FBI obtained historical cell site location data[3] for Target Telephone 1 from T-Mobile by way of a federal search warrant. Analysis of those data showed that Target Telephone 1 was in the vicinity of CHRISTOPHER's residence in May and June 2020. On May 18, 2020, the day Inmate 1 passed "Dude" his girlfriend's number and the day Target Telephone 1 was activated, Target Telephone 1 received 5 incoming calls. For each of those calls, Target Telephone 1 used the same cell tower in Pittsburg, California. According to Cellmapper, a crowd-sourced internet site that provides the locations and network capabilities of phone company cell towers, the same cell tower that Target Telephone 1 used for those five calls on May 18, 2020 is within a mile of CHRISTOPHER's residence, **Target Location 2**. Between May 25 and May 27, 2020, the days in which Target Telephone 1 was in communication with SMITH, Target Telephone 1 received three incoming calls, each of which used the same cell tower in Pittsburg, California, that is within a mile of **Target Location 2**. On June 18, the day after the known communication between SMITH and Target Telephone 1, Target Telephone 1 received one phone call. Again, the phone used the same cell tower that is within a mile of **Target Location 2**. There were a total of 18 calls to or from Target Telephone 1 that accessed the same cell tower.

57. Finally, Target Telephone 1 used a cell tower located on Trinidad Drive in Tiburon, California, for five calls. That tower is approximately 7 miles from SQP, but is located directly across the water and, according to Cellmapper, is the tower that services the area around SQP. CHRISTOPHER works at SQP. For these reasons, and the reasons stated above, I believe CHRISTOPHER is the corrupt CO using Target Telephone 1.

F. **Evidence of Previous Contraband Smuggling**

58. Further review of Inmate 1's phone and the TARGET SUBJECTS's financial records indicate a similar instance of contraband smuggling in December 2019. SMITH sent Inmate 1 the following screenshots, all indicating her communications with "Dude":

///

///

///

---

[3] I know that T-Mobile is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected.



59. Based on my training and experience and my knowledge of the facts of this investigation, I believe that in the first screenshot, SMITH sent CHRISTOPHER an image of the box full of contraband items she had shipped to him. The package label indicates that a 6-pound box was addressed to Associate 2 at an address in Pittsburg, CA from a UPS store in Las Vegas, NV on November 27, 2019. SMITH's residence, **Target Location 1**, is in Las Vegas, Nevada. I believe that CHRISTOPHER sent her a text message on December 2, 2019, letting her know that it had not yet arrived ("nothing came today"). I believe that SMITH then responded that she would "follow up," meaning that she would check on the package's delivery status, and then she sent CHRISTOPHER a screenshot of her phone showing she had checked UPS's parcel tracking site and that the package was scheduled for delivery that day.

60. Based on my training and experience, I believe, based on the continued message string, that CHRISTOPHER contacted SMITH the next day to tell her how much it was going to cost to smuggle the items into the prison. I believe that when CHRISTOPHER said, "its gon run $5000 for the ten items," he meant that he had received the box, that it contained 10 phones, and that he was going to charge $5,000 ($500 per phone) to smuggle the phones into the prison. I further believe that, when he told SMITH he was going to have her "send it to 2 different people" and "split it up between Venmo and Walmart," he meant that he was going to use two "cut-outs" to receive the money and that he was going to have her transfer the money to those people through different means. I believe CHRISTOPHER was taking these precautions in order to hide his involvement in the smuggling scheme.

61. A couple of hours later, "Dude" messaged SMITH "Send $2000 to [Associate 2] Venmo" and "You can send that for now. Waiting on the other person to see if we good." I believe that, in those messages, CHRISTOPHER was instructing SMITH to send a portion of the payment ($2,000) to Associate 2's Venmo account "for now," and that he would let her know

15

where to send the rest of the money once he confirmed with the second person he was using to receive his payment. Records from Venmo indicate that, on the same day, Associate 2's Venmo account received $2,000 from a Venmo account associated with the name "Tanisa Smith."

62. Review of Facebook, Google search warrant returns, and toll records, indicate that Associate 2 and CHRISTOPHER are close associates. Toll analysis shows that Associate 2 is one of CHRISTOPHER's top correspondents. Associate 2 often "likes" and comments on CHRISTOPHER's Facebook posts. I also reviewed images from Associate 2's Google Drive and discovered multiple images that appear to show CHRISOPHER and his family, and images that appear to show Associate 2's children playing with CHRISTOPHER's children.

## V. CONCLUSION

63. Based on the information above, I submit that there is probable cause to believe that CHRISTOPHER, SMITH, WELLS, and others conspired to commit honest services fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 1349. Therefore, I respectfully request that the Court issue the proposed criminal complaint.

I declare under penalty of perjury that the foregoing are true and correct to the best of my belief.

/s/ *Candace Bond*
CANDACE BOND
Special Agent
Federal Bureau of Investigation

Sworn before me over the telephone, pursuant to Federal Rules of Criminal Procedure 4(d) and 4.1, this  30th  day of August, 2021.

_____
HON. JOSEPH C. SPERO
Chief United States Magistrate Judge

16